IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DHP HOLDINGS II CORPORATION, et al.,[1] | ) | Case No. 08-13422 (___) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |

**DEBTORS' MOTION PURSUANT TO BANKRUPTCY CODE
SECTIONS 105(a), 363, AND 507(a) FOR AN ORDER AUTHORIZING
THE DEBTORS TO (I) PAY AND/OR HONOR PREPETITION WAGES,
COMMISSIONS, SALARIES, EMPLOYEE BENEFITS, AND OTHER
COMPENSATION OR REIMBURSEMENTS; (II) REMIT WITHHOLDING
OBLIGATIONS; (III) MAINTAIN EMPLOYEE COMPENSATION AND CERTAIN
BENEFITS PROGRAMS AND PAY RELATED ADMINISTRATIVE OBLIGATIONS;
AND (IV) HAVE APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS
RECEIVE, PROCESS, HONOR, AND PAY CERTAIN CHECKS
PRESENTED FOR PAYMENT AND HONOR FUND TRANSFER REQUESTS**

The above-captioned debtors and debtors-in-possession (the "Debtors") in the

instant chapter 11 cases (the "Chapter 11 Cases"), hereby move this Court (the "Motion") for the

entry of an order (the "Order"), pursuant to sections 105(a), 363, and 507(a) of title 11 of the

United States Code (the "Bankruptcy Code"), authorizing the Debtors to (i) pay and/or honor

prepetition wages, commissions, salaries, employee benefits, and other compensation or

reimbursements; (ii) remit withholding obligations; (iii) maintain employee compensation and

certain benefits programs and pay related administrative obligations; and (iv) have applicable

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are DHP Holdings II Corporation (5945); DESA LLC (5717); DESA Heating LLC (8137); DESA Specialty LLC (8143); DESA FMI LLC (8146); and DESA IP LLC (8149). The address for each of the Debtors is 2701 Industrial Drive, Bowling Green, KY 42101.

for payment and honor certain fund transfer requests.  In further support of this request, the

Debtors state as follows:

### Jurisdiction and Venue

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(A) and (O).

2.    The statutory predicate for the relief sought by this Motion are Bankruptcy

Code Sections 105(a), 363 and 507(a).

### General Background

3.    On the date hereof (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under the Bankruptcy Code.  The Debtors are continuing in

possession of their property and are managing their business as debtors in possession, pursuant to

sections 1107 and 1108 of the Bankruptcy Code.

4.    No trustee or examiner has been appointed in these Chapter 11 Cases.

5.    The factual background relating to the Debtors' commencement of these

Chapter 11 Cases is set forth in detail in the *Declaration of Craig S. Dean, Chief Restructuring*

*Officer of the Debtors, in Support of First Day Motions* (the "Dean Declaration") filed

contemporaneously with this Motion and incorporated herein by reference.

2

**Relief Requested**

6.     At the start of December 2008, the Debtors employed approximately 623

full-time employees, both hourly and salaried, in supervisory, management, manufacturing and

administrative positions to perform the functions necessary to effectively and efficiently operate

the Debtors' businesses (collectively, the "Employees"). The Debtors employed no part-time

employees but from time to time hired temporary employees through third party temporary

agencies.  Approximately 226 of the Employees were salaried and 397 Employees were

compensated on an hourly basis.  In addition, 17 Employees who are sales personnel were

entitled to receive commissions.

7.     Approximately 275 of the Employees who worked in the manufacturing

plant in Bowling Green, Kentucky are members of the Sheet Metal Workers' International

Association (the "Union Employees").  Two active collective bargaining agreements (the

"Collective Bargaining Agreements") governed the employment of the Union Employees.

8.     Before the Petition Date, on December 16, 2008, the Debtors sent notices of

planned employee terminations pursuant to the Worker Adjustment and Retraining Notification

Act of 1998, as amended (the "WARN Act") to salaried Employees who worked in the Debtors'

facility located in Bowling Green, Kentucky and to field sales Employees.  On December 17,

2008, the Debtors sent notices of planned employee terminations pursuant to the WARN Act to

hourly and salaried Employees who worked in the Debtors' facilities located in Santa Ana,

California and hourly Employees, including Union Employees, who worked at the Debtors'

facilities located in Bowling Green, Kentucky, as well as to the Union Employees' collective

bargaining union representatives.  Shortly thereafter, all hourly Employees were advised verbally

3

that they were temporarily laid off and should not return to work unless the Debtors informed them it was necessary.

9.    Subsequently, on December 21, 2008, the Debtors notified 331 Employees (52 salaried and 279 hourly), including all Union Employees (collectively, the "Terminated Employees"), as well as the Union Employees' collective bargaining representative unions, of their termination of employment effective as of December 21, 2008.  In conjunction therewith, the Debtors (i) by virtue of the termination of all Union Employees, the Debtors terminated the Collective Bargaining Agreements effective as of December 21, 2008 and (ii) the Debtors also terminated the Medical Plans (as defined below), effective as of December 21, 2008.  The Debtors were compelled to terminate the Medical Plans because the Debtors did not have the ability to fund the payment of claims incurred under such plans after December 21, 2008.

10.    As a result of the foregoing terminations, on the Petition Date the Debtors employed not more than 292 (consisting of 174 salaried and 118 hourly) Employees (collectively, the "Remaining Employees") to perform the functions necessary to effectively and efficiently wind down the Debtors' remaining business operations.

11.    By this Motion, the Debtors seek to minimize the personal hardship to the Employees as a result of the filing of these Chapter 11 Cases, and to minimize the disruption to the Debtors' business, for the benefit of the Debtors' creditors and their estates, by requesting, in their discretion, the authority (a) to pay and/or honor, *inter alia*, certain prepetition claims for, among other items, wages, commissions and salaries (the "Wages"), employee benefits and other compensation or reimbursements (the "Benefits") for all Employees, including those Terminated Employees terminated shortly prior to the Petition Date, and to pay all costs incident to the

4

foregoing (collectively, the "Wages and Benefits"), and (b) to continue to pay and/or honor such Wages and certain Benefits for the Remaining Employees as they become due postpetition in the ordinary course of the Debtors' business.  The Wages and Benefits for which this relief is sought are set forth in detail below.

12.    The Debtors have been paying and/or honoring the Wages and Benefits in the ordinary course of business up to the Petition Date, with the recent exception of the payment of certain claims under the Medical Plans as described below.  The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Wages and Benefits, to the extent described and requested to be paid and/or honored herein, on an ongoing basis and in the ordinary course of business.  Consequently, there is no reason for the payment of the Wages and Benefits to the Employees to be disrupted, which disruption would directly harm the Employees and the Debtors' efforts in these Chapter 11 Cases.

## **Wages and Benefits**

A.        **Wages and Salaries and Associated Withholding**

13.    The Debtors' historic average bi-weekly gross payroll was approximately $1,084,762.35, which figure included wages and salaries, and taxes (including withholding taxes paid by Employees), and withholdings for various Employee benefits, which are described more fully below, but excluded commissions.  Salaried Employees were paid bi-weekly every other Friday and hourly Employees were paid weekly, one week in arrears, every Friday.[2]  The date on which all of the Debtors' Employees were last paid was December 19, 2008, for the period ended

---

[2]  Upon payment of accrued wages on the bi-weekly pay date, salaried Employees are brought current with respect to unpaid wages while hourly Employees are still owed one-week's salary.  In other words, hourly Employees are always one week in arrears with respect to unpaid wages upon the occurrence of each bi-weekly pay date.

December 19, 2008, for salaried Employees, and for the period ended December 12, 2008, for hourly Employees. In addition, the Debtors (i) prepaid 40 of their salaried Employees on December 22, 2008, for the period through December 26, 2008, in the total amount of $86,217.82 and (ii) paid their hourly Employees on December 23, 2008, for the period through December 21, 2008, in the total amount of approximately $24,000.[3]

14.    As of the Petition Date, the Debtors owe approximately $53,000 for unpaid Wages consisting of commissions earned by Employees in the sales department for the months of November and December 2008. The Debtors therefore seek authority to pay the unpaid Wages up to a total and aggregate maximum amount of $55,000. No Employee is owed more than $10,950 in unpaid Wages.[4]

15.    In addition, the Debtors anticipate that some or all of the checks issued to salaried Employees on December 22, 2008 in the amount of $86,217.82 and to hourly Employees on December 23, 2008 in the approximate amount of $24,000 may not have cleared as of the Petition Date. Insofar as there are any checks issued in respect of any prepetition Wages, but not yet cashed, for pay periods before the Petition Date, the Debtors request authority for such checks to be honored postpetition in the ordinary course of the Debtors' business or, if necessary, to reissue such checks.

16.    The Debtors' payroll is processed and disbursed by Automated Data Processing ("ADP"). Certain Employees are paid by direct deposit while other Employees are

---

[3] No hourly Employees have worked from December 21, 2008 to the Petition Date, and hourly Employees worked minimal hours between December 12, 2008 and December 21, 2008.

[4] Four former employees (the "Terminated Employees") are owed payments under prepetition severance agreements (the "Severance Payments"). As of the Petition Date, the Debtors owe the Terminated Employees approximately $66,000. The Debtors do not seek to pay the Severance Payments pursuant to this Motion.

6

paid via live checks. The Debtors fund Wage payments paid to Employees by direct deposit

transferred from the Debtors' payroll account maintained at U.S. Bank on the Wednesday

immediately prior to each pay date. Employees receive their direct deposits through ADP on the

applicable pay date. With respect to Employees paid via live check, ADP processes checks

drawn on the Debtors' payroll account and issues them to the applicable Employees on the pay

date. On the Friday pay date, ADP automatically debits from the Debtors' payroll account the

fees that it is owed for processing the Debtors' payroll. The average amount deducted by ADP

for the processing of the Debtors' payroll and related administration (the "ADP Administration

Fees") is approximately $3,500 per week but will be greatly reduced on a postpetition basis on

account of the lower number of Remaining Employees. Although the Debtors do not believe that

they owe ADP any unpaid ADP Administration Fees as of the Petition Date, they hereby request

in an abundance of caution the authority to pay ADP Administration Fees up to the amount of

$3,500. The Debtors also request authority to pay ADP the ADP Administration Fees that come

due postpetition in the ordinary course of the Debtors' business.

       17.    In the ordinary course of their business, the Debtors routinely withhold from

Wages certain amounts that the Debtors are required to transmit to third parties for purposes such

as Social Security and Medicare, federal and state or local income taxes, contributions to the

Debtors' benefit plans described more fully below, 401(k) contributions, garnishment, child

support, union dues, or similar obligations pursuant to court order or law (collectively, the

"Withholding Obligations"). In addition to the Withholding Obligations, the prepetition amount

of which is approximately $67,108.11 (consisting of (i) $38,843.74 in withheld but unremitted

union dues for the months of October through December 2008, (ii) $27,764.37 in withheld but

unremitted premiums under the Medical Plans for the month of December 2008, and (iii) $500 in

withheld but unremitted garnishments), the Debtors estimate that, as of the Petition Date,

approximately $14,000 of the Debtors' contributions (which number is included in the total

unpaid Wages set forth above) to employee tax obligations were incurred and unpaid in

connection with earned but as yet unpaid Wages (the "Employer Tax Obligations").  The

Debtors request authority to pay the Employer Tax Obligations and to satisfy the other

Withholding Obligations in connection with the payment of the Wages and to the extent

described more fully below up to the total amount of $90,000.

**B.    Business Expense Reimbursements**

18.    The Debtors customarily reimburse Employees who incur business expenses

in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses

typically include, but are not limited to, business-related travel expenses, including air travel,

auto travel and car rental, lodging, meal charges, business lunches, entertainment and trade show

expenses, telephone charges, relocation expenses, and miscellaneous other allowed expenses (the

"Reimbursement Obligations").

19.    It is not possible for the Debtors to determine the exact amounts of

Reimbursement Obligations that are due and owing for any particular time period since the

expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly

basis and because there may be some delay between when an Employee incurs an expense and

submits the corresponding expense report for processing.  Based on historical experience, the

Debtors anticipate that, as of the Petition Date, the Debtors owe an estimated $60,000 in

Reimbursement Obligations for all Employees for expense reports that were submitted as well as

8

those that had not yet been submitted as of the Petition Date.  The Debtors seek authority to pay

any prepetition Reimbursement Obligations up to a total amount of $60,000, and to continue to

honor Reimbursement Obligations incurred by Remaining Employees postpetition in the

ordinary course of the Debtors' business.  The Debtors also seek authority to honor checks issued

for such Reimbursement Obligations prepetition, but which remain uncashed as of the Petition

Date.[5]

**C.**    **Health and Related Benefits**

20.    Prepetition, the Debtors provided several health and related benefit plans to

their Employees, including medical, dental, vision and prescription drug insurance, health care

reimbursement accounts, life insurance, accidental death and dismemberment insurance, and

short and long-term disability insurance.  As noted above, the Debtors have terminated the

Medical Plans effective as of December 21, 2008 and, accordingly, the relief requested herein

with respect to the Medical Plans relates solely to the payment of prepetition accrued obligations

thereunder.

(i)    Medical Plans

21.    Prepetition, the Debtors self-insured medical, dental, vision, and

prescription drug claims incurred by Employees up to the stop-loss limits set forth below

pursuant to various health benefit plans (the "Medical Plans").  The Debtors have a stop loss

insurance policy with HCC Life Insurance Company for claims incurred under the Medical Plans

that exceed $150,000 per claimant.  Meritain Health ("Meritain") is the third party administrator

---

[5]  The Debtors issued checks for Reimbursement Obligations in the total approximate amount of $90,000 on December 26, 2008.  The Debtors anticipate that some or all such checks may not have cleared as of the Petition Date.

for the Medical Plans. Claims payments under the Medical Plans generally were funded by the

Debtors on a weekly basis in compliance with weekly requests made by Meritain. The Debtors

transferred funds to their benefits account maintained at U.S. Bank and issued a check for the

requested amounts to Meritain. Employees contributed to the plans, with such contributions

varying based on income and coverage level.

22.    As described above, the Debtors terminated their Medical Plans on

December 21, 2008, because they no longer had the funds necessary to provide continuing

benefits thereunder. Since the Medical Plans have been terminated, the Debtors do not seek

authority to provide any future benefits under such plans. For all Medical Plans, the Debtors

seek authority to continue to honor and pay all unreimbursed claims and administrative fees

incurred before December 21, 2008.

23.    The Debtors estimate that they may owe up to a combined approximate

amount of $822,929.41 to Meritain on account of (i) processed but unpaid prepetition health

benefit claims of Employees and their covered dependants in the approximate amount of

$791,929.41 (the "Prepetition Processed Medical Claims") and (ii) prepetition administrative

fees in connection with the maintenance and administration of the Medical Plans in the

approximate amount of $31,000 (the "Prepetition Medical Administrative Fees"). In addition,

the lag time for claims on services performed by physicians and health benefit service providers,

but not yet submitted or paid, is approximately up to two months. Employees have up to one

year to submit claims under the Medical Plans. Based on the average monthly amount of claims

paid under the Medical Plans, the Debtors estimate that there is an additional amount of

approximately $550,000 in outstanding prepetition medical, dental, vision, and prescription drug

services claims for Employees and their covered dependants under the Medical Plans that have

not yet been submitted and/or processed, exclusive of administrative costs owed to Meritain (the

"Prepetition Unprocessed Medical Claims"). The Debtors seek authority to pay the Prepetition

Processed Medical Claims, the Prepetition Unprocessed Medical Claims, and the Prepetition

Medical Administrative Fees in the ordinary course of their business up to the aggregate amount

of $1,375,000.

        (ii)    FlexSave Program

        24.    The Debtors offer their Employees access to flexible spending accounts

("FSAs") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. The

FSA program (the "FSA Program") is administered for the Debtors by FEBCO, Inc. ("FEBCO").

An eligible Employee's FSA deduction is taken out of his or her paycheck each pay period and

put in an account to be used for eligible expenses throughout the year. The Debtors estimate that

approximately $2,500 in accrued FSA contributions from three Employees remain unremitted as

of the Petition Date (the "FSA Contributions"). The Debtors seek authority to honor the FSA

Contributions in connection with satisfaction of the Wages, and to continue to provide the FSA

Program postpetition in the ordinary course of the Debtors' business until the FSA Contributions

have been consumed. FEBCO has agreed that it will continue to administer the FSA Program

free of charge on a postpetition basis. Permitting the Debtors to continue the program will avoid

adverse tax consequences for Employees and will cost the Debtors nothing. The Debtors do not

believe they owe any unpaid prepetition Administration Fees to FEBCO as of the Petition Date.

In an abundance of caution, however, the Debtors seek authority to pay FEBCO any remaining

prepetition administration fees (the "FEBCO Administration Fees") up to $200 in the ordinary course of business postpetition.

      (iii)    <u>Disability Plans and AD&D and Life Insurance</u>

<u>The Disability Plans</u>

      25.    Prior to December 21, 2008, the Debtors provided all exempt Employees with income protection plans for short-term and long-term disability (collectively, the "Disability Plans"). The Debtors paid the entire cost of the Disability Plans.

      26.    The Debtors do not owe any amounts on account of unpaid prepetition obligations in connection with the Disability Plans. The Disability Plans were discontinued upon termination of the Medical Plans on December 21, 2008. Accordingly, the Employees have no entitlement to benefits under the Disability Plans as of December 21, 2008.

<u>Life and AD&D Insurance</u>

      27.    The Debtors provide accidental death and dismemberment coverage ("AD&D Insurance") through The Lincoln Financial Life Insurance Company ("Lincoln Financial") to all salaried Employees in an amount of up to two times an Employee's annual salary.

      28.    The Debtors also provide life insurance benefits to all salaried Employees through Lincoln Financial in the amount of two times the Employee's basic annual earnings or a flat rate (the "Life Insurance"). The Debtors' premium payments for Life Insurance and AD&D Insurance, inclusive of any administrative fees owed (together, the "Insurance Premiums")

12

aggregated approximately $12,804.27 per month, inclusive of supplemental insurance premiums paid by the Employees to the Debtors to obtain additional life insurance coverage.[6]

29.    The Debtors estimate that they may owe up to $25,000 in unpaid prepetition premiums on account of unpaid Insurance Premiums.  The Debtors seek authority to pay any prepetition Insurance Premiums up to a total amount of $25,000 and to continue to pay their Insurance Premium contribution obligations incurred postpetition with respect to the Remaining Employees in the ordinary course of the Debtors' business.

(iv)    Paid Time Off

30.    The Debtors have various policies whereby Employees are permitted to take paid time off for jury duty, bereavement leave, military duty and sick leave (collectively, the "Paid Time Off").

31.    The Debtors provide Employees with Paid Time Off under the following conditions:  (i) Employees fulfilling jury duty are reimbursed for the difference between the Employee's regular pay and the earnings received from the court; (ii) Employees taking time off due to a death in their immediate family receive three days' regular pay; (iii) Employees serving time in the military are eligible for the difference between the Employee's regular pay and the earnings received from the military for up to two weeks in any calendar year (Employees engaged in a long term military leave of absence are granted an unpaid leave); and (iv) Employees who are not Union Employees are eligible for up to five days' regular pay in the

---

[6] Employees may purchase supplemental life insurance up to five times their annual salary.  Employees who purchase supplemental life insurance pay the total cost of the premiums in connection therewith.  Such cost varies based upon the Employee's age and gender.

event of an illness of the Employee, while certain Union Employees are entitled to Paid Time Off for time spent at medical appointments.

32.    The Debtors seek authority to honor their existing Paid Time Off policies, in their discretion, to permit Remaining Employees to use their prepetition accrued Paid Time Off in the ordinary course of business and to honor similar Paid Time Off policies on a postpetition basis and in the ordinary course of the Debtors' business.  The Debtors historically have not cashed out Paid Time Off and do not seek to cash out Paid Time Off pursuant to this Motion.

(v)    <u>Holidays and Vacation</u>

33.    The Debtors observe twelve paid holidays throughout the year, including federal holidays and two floating holidays (collectively, the "Holidays").  Full-time Employees who work on a Holiday are paid for the Holiday at two and one-half times their regular rate. Union Employees who worked on a Holiday were paid for the Holiday at one and one-half times their regular rate.

34.    Employees accrue vacation time based on length of service ("Vacation Time").  Specifically, all regular, full-time, salaried Employees who are not Union Employees earn:  (a) two weeks of vacation as of January 1 in their second calendar year of employment during the first four years of service; (b) three weeks of vacation as of January 1 after five years of service; (c) four weeks of vacation as of January 1 after fifteen years of service; and (d) five weeks of vacation as of January 1 after twenty years of service.  During the first year of employment, Vacation Time is based on months of service.  Vacation Time must be used in the year it is accrued and may not be carried over to the next year.

35.    After a probationary period, Union Employees earned Vacation Time at the following rates: (a) one week of vacation after one year of employment; (b) two weeks of vacation after five years of employment; and (c) three weeks of vacation after ten years of employment. Vacation Time for Union Employees accrued as of July 1.

36.    Employees are paid as vacation days are taken. Vacation Time is to be taken within the calendar year it is granted. Employees whose employment with the Debtors is terminated receive payment for accrued Vacation Time minus any vacation already taken in that calendar year.

37.    As of the Petition Date, the Debtors believe that Employees have approximately $973,946.36 of accrued but unused Vacation Time, which would have been used or paid out to Employees in the ordinary course of business. Of that amount, approximately $110,811.82 consists of Vacation Time (the "California Vacation Time") accrued by Terminated Employees in California (the "Terminated California Employees"). The Debtors request authority, in their discretion, to pay the Terminated California Employees up to an aggregate amount of $111,000 on account of the accrued California Vacation Time, and to allow Remaining Employees to use (but not cash out) their accrued Vacation Time in the ordinary course of business.

(vi)    401(k) Plans

38.    Salaried Employees working at all facilities (Bowling Green, KY, Manchester, TN, Russellville, AL and Santa Ana, CA) and hourly employees working at the Manchester, TN facility are eligible to contribute to a 401(k) retirement plan administered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (the "Merrill Lynch 401(k) Plan"). Hourly Employees working at the Santa Ana, CA and Russellville, AL facilities are eligible to contribute

15

to a 401(k) retirement plan administered by John Hancock (the "John Hancock 401(k) Plan" and,

together with the Merrill Lynch 401(k) Plan, the "401(k) Plans"). Salaried Employees are

eligible to contribute to the 401(k) Plans beginning March 1 or September 1 following six full

months of service. Employees may contribute to the 401(k) Plans up to maximum amounts

allowed under IRS guidelines. For the Merrill Lynch 401(k) Plan, the Debtors match 100% for

the first 1% of the Employee's contribution and 50% for each additional contribution percentage

point up to 6%. For the John Hancock 401(k) Plan, the Debtors match 1 ½ % of an Employee's

contribution up to 3%.

39.    The Debtors estimate that, as of the Petition Date, no 401(k) contributions

from Employees or matching contributions remain unremitted, other than as part of Wages

described above. The Debtors owe Merrill Lynch approximately $1,000 in prepetition

administrative fees (the "401(k) Plan Administration Fees"), and accordingly seek authority to

pay $1,000 to Merrill Lynch for the payment of the 401(k) Plan Administration Fees. The

Debtors further request authority, in their discretion, to continue their existing 401(k) Plans,

including the ability, in their sole discretion, to continue to make matching postpetition

contributions under the 401(k) Plans for the Remaining Employees in the ordinary course of the

Debtors' business and pay associated administration fees in connection therewith.

(vii)    Union Pension Plan

40.    DESA Heating LLC ("DESA Heating") sponsors the Industrial Pension Plan

(the "Union Pension Plan") for the benefit of Union Employees pursuant to the terminated

Collective Bargaining Agreements. In November 2008, DESA Heating contributed the

minimum amount of $246,441 as required by applicable law. For normal retirement, a Union

Employee's pension benefit is fully vested after 5 years of employment. The Debtors are not requesting authority to fund any prepetition amounts under the Union Pension Plan by this Motion.

Workers' Compensation

41.    Under the laws of various states, the Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain several annual workers' compensation policies (the "Workers' Compensation Policies") with National Union Fire Insurance Company of Pittsburgh, PA and Illinois National Insurance Co. (collectively, the "Workers' Compensation Insurers") pursuant to which the Workers' Compensation Insurers provides workers' compensation insurance coverage up to $1,000,000 per occurrence, with a $350,000 deductible per claim, for employer liability for the states in which the Debtors' Employees reside. The current terms of the Workers' Compensation Policies run through October 1, 2009, and cost an estimated total of approximately $244,446 on an annual basis.

42.    The Debtors believe that they may owe up to $10,307.34 for the prepetition insurance premiums for the month of December 2008 (the "Workers' Compensation Premium Payments"), and seek authority to make such payments up to $11,000. The Debtors also seek authority to maintain their workers' compensation and other liability insurance in accordance with applicable law postpetition for the benefit of Remaining Employees, and to pay all premium installments as they come due in the ordinary course of business.

**Bonus Program**

43. Prepetition, the Debtors offered incentive programs for certain management-level Employees (the "Management Bonus Programs") pursuant to which such Employees are eligible to receive bonuses based on performance metrics defined for EBITDA and working capital. Employees who satisfy their respective targets under the Management Bonus Program and continue to be employed at the end of the respective fiscal year are entitled to receive a bonus. With the exception of bonuses due for the fiscal year ending March 2008,[7] in the ordinary course of the Debtors' business, bonuses under these programs are paid following the completion of an audit for the respective fiscal year. For the fiscal year ending February 2009, 25 Employees are eligible to receive a total of $946,952, which amount is contingent upon EBITDA and working capital performance during this fiscal year. As of the Petition Date, the Debtors estimate that bonuses in the amount of approximately $188,648 for seven Employees have accrued based on their year to date performance through November 2008. By this Motion, the Debtors do not seek authority to pay any prepetition bonuses, but reserve the right to seek approval of such programs pursuant to a separate motion filed with the Court.

**Miscellaneous Benefit Programs**

Tuition Reimbursement Program

44. The Debtors offer additional benefits to Employees including a program by which the Debtors reimburse eligible Employees employed for at least one year for tuition, books and school fees for approved courses in which the Employees receive a grade of "C" or

---

[7] As of the Petition Date, $517,024 in earned bonuses for 15 Employees for the fiscal year ending March 1, 2008 remained unpaid.

18

better (the "Tuition Reimbursement Program"). The Debtors estimate that they owe up to $9,208

on account of prepetition reimbursement obligations in connection with the Tuition

Reimbursement Program (the "Tuition Reimbursement Amounts"). The Debtors seek authority,

in their discretion, to pay the Tuition Reimbursement Amounts that may be owed under the

Tuition Reimbursement Program up to $10,000. The Debtors do not seek authority to continue

the Tuition Reimbursement Program on a postpetition basis.

Car Allowances

45.    The Debtors' business requires certain Employees to travel substantial

distances in connection with fulfilling their job duties. Accordingly, the Debtors provide such

Employees with car allowances (the "Car Allowances") that are treated as income for such

Employees. The Debtors pay approximately 16 Employees a Car Allowance on a monthly basis.

The Debtors estimate that the amount of prepetition unpaid Car Allowances (the "Car Allowance

Amount") is approximately $12,550. The Debtors seek authority to pay the Car Allowance

Amount up to $13,000 due as of the Petition Date, and to continue providing Car Allowances

only to sales personnel in their sole discretion on a postpetition basis in the ordinary course of

business. The Debtors are terminating Car Allowances for management as of the Petition Date.

46.    In sum, the Debtors seek the authority to pay or honor in their sole

discretion the prepetition Wages and Benefits, solely to the extent described herein, including:

      a.     the Wages;

      b.     the ADP Administration Fees;

      c.     the Withholding Obligations;

      d.     the Employer Tax Obligations;

e.    the Reimbursement Obligations;

f.    the Prepetition Processed Medical Claims;

g.    the Prepetition Medical Administrative Fees;

h.    the Prepetition Unprocessed Medical Claims;

i.    the FSA Program and FEBCO Administration Fees;

j.    the Insurance Premiums;

k.    the Paid Time Off;

l.    the Vacation Time;

m.    the 401(k) Plans and 401(k) Administration Fees;

n.    the Workers' Compensation Premium Payments;

o.    the Tuition Reimbursement Amounts;

p.    the Car Allowance Amounts; and

q.    any other prepetition amounts due under any other benefit program up to the amounts described in this Motion;

each as described more fully above, and to continue, in their sole discretion, the foregoing Benefits on a postpetition basis.[8]

### Basis for Relief

47.    Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*).  Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing.

---

[8] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

68700-001\DOCS_NY:17222.11

Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing. Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

48. The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[9] The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3rd Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the

---

[9] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

payments in order to retain its current employees and maintain positive employee morale—two

factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing*

H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the

"necessity of payment" doctrine applies to the payment of prepetition employee compensation

and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the

"necessity of payment" doctrine, bankruptcy court should defer to the debtor's business

judgment in permitting payment of certain workers' compensation claims).

49.    This Court similarly has approved the payment of prepetition claims of

employees for wages, salaries, expenses, and benefits on the grounds that the payment of such

claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re EZ*

*Lube, LLC, et al.*, 08-13256 (CSS) (Bankr. D. Del. December 10, 2008); *In re Net Effect, Inc.,*

Case No. 08-12008 (KJC) (Bankr. D. Del. August 28, 2008); *In re Western Nonwovens, Inc., et*

*al.,* Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Answer Financial Inc.*, Case

No. 08-10140 (MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Aegis Mortgage Corporation*, Case

No. 07-11119 (BLS) (Bankr. D. Del. August 15, 2007); *In re Mortgage Lenders Network USA,*

*Inc.*, Case No. 07-10146 (Bankr. D. Del. Feb. 7, 2007) (PJW); *In re Global Home Products LLC,*

*et al.*, Case No. 06-10340 (Bankr. D. Del. April 11, 2006)(KG); *In re Proxim Corp.*, Case No.

05-11639 (PJW) (Bankr. D. Del. June 15, 2005); *In re Maxide Acquisition, Inc.*, Case No. 05-

10429 (MFW) (Bankr. D. Del. Feb. 15, 2005); *In re Redback Networks, Inc.*, Case No. 03-13359

(MFW) (Bankr. D. Del. Nov. 5, 2003).

50.    The "necessity of payment" doctrine authorizes the Debtors to pay the

amounts they seek authority to pay pursuant to this Motion because the Debtors' Remaining

Employees are critical assets necessary both to the Debtors' operations and the successful prosecution of these Chapter 11 Cases.

51.    Pursuant to sections 507(a)(4)(A) of the Bankruptcy Code, claims of Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Commencement Date are afforded priority unsecured status to the extent of $10,950 per Employee. The Debtors believe that unpaid Wages relating to the period prior to the Petition Date constitute priority claims under section 507(a)(4) of the Bankruptcy Code. As priority claims, the unpaid Wages must be paid in full before any general unsecured obligations of the Debtors may be satisfied. Accordingly, the relief requested may affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors or other parties in interest.

52.    Pursuant to the relief requested herein, the Debtors request authority only to pay up to the $10,950 statutory cap under Bankruptcy Code section 507(a)(4) to each Employee on account of all unpaid Wages collectively owing to such Employee.[10]

53.    Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the prepetition Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. The Terminated Employees relied upon the benefits provided under the

---

[10]  In the event any unpaid amounts owing to any Employee on account of unpaid Wages exceed the $10,950 statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

Medical Plans in obtaining health care prior to the termination of their employment and the Medical Plans on December 21, 2008. The sudden termination of their employment caused by the Debtors' abrupt loss of financing and the depressed economy likely will result in further hardship to the Terminated Employees. The payment of their accrued Wages and Benefits is necessary to avoid any further adverse consequences for such individuals. Moreover, the Debtors believe that if they are unable to honor accrued Employee Wages and the Benefits described above for Remaining Employees, including honoring Paid Time Off, the morale and loyalty of the Remaining Employees will be jeopardized at a time when their support is critical as the Debtors wind down their operations for the benefit of all creditors. If the Debtors are not authorized to pay for prepetition health benefits, then many of the Debtors' Employees may not be reimbursed or otherwise have their already incurred health benefit claims paid. In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed. The Debtors believe such uncertainty will cause significant and unwarranted hardship to Terminated Employees and Remaining Employees alike.

54.    Additionally, the Withholding Obligations do not constitute property of the Debtors' estate and principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors'

24

property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors

cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors'

failure to submit these payments.

55.    Finally, the Debtors submit that, with respect to the wage-related taxes that

constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the

Debtors' estate given that the relevant taxing authorities would have priority claims under

section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies

payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third

parties, such as withheld funds with respect to the 401(k) Plans, are not property of the Debtors'

estates. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a

debtor in trust for another and, as such, are not property of the debtor's estate).

56.    The Remaining Employees have an intimate knowledge of the operation of

the Debtors' business and are critical components to the success of these Chapter 11 Cases.

Deterioration in the morale and welfare of the Remaining Employees at this critical time

undoubtedly would adversely impact the Debtors and their ability to maximize the value of their

assets. Satisfaction of the Wages and Benefits, as described herein, is necessary to maintain the

Remaining Employees' morale and willingness to remain working for the Debtors during the

cases and to insure continued, efficient operation in order to maximize value for all creditors.

57.    Finally, pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy

Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that

arose before the filing of the petition" shall not be granted by the Court within 20 days of the

Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable

harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as

supported by the Dean Declaration, the Debtors submit that the requirements of Rule 6003 have

been met and that the relief requested in this Motion is necessary to avoid immediate and

irreparable harm.

**No Assumption or Assignment of Employee Benefits**

58.    To the extent any employee benefit or compensation plan or arrangement is

deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the

Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court

authorizes any or all of the payments described above, such payments should not be deemed to

constitute a postpetition assumption or adoption of the programs, policies, or agreements as

executory contracts pursuant to section 365 of the Bankruptcy Code. Moreover, authorization to

pay all amounts on account of Employee Wages and Benefits shall not affect the Debtors' right

to contest the amount or validity of these obligations.

**Request for Authority for Banks and Other Financial Institutions
to Honor Checks Issued to Pay Wages and Benefits, to Honor All
Fund Transfer Requests Relating to the Foregoing, and to Pay All
Processing Fees Associated with Payment of Employee Wages and Benefits**

59.    The Debtors request that all applicable banks and other financial institutions

be authorized to receive, process, honor, and pay all checks presented for payment and to honor

all fund transfer requests made by the Debtors to Employees, whether such checks were

presented or fund transfer requests were submitted prior to, on, or after the Petition Date. The

Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all

Employee Wages and Benefits, to the extent described herein, on an ongoing basis and in the

26

ordinary course of business. Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to Employee Wages and Benefits. Further, the Debtors seek to retain the discretion to decide which Employee Wages and Benefits it will pay and honor, and nothing in this Motion shall be deemed an admission by the Debtor that any Employee Wages and Benefits will in fact be paid or honored.

60.    Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Employee Wages and Benefits including, but not limited to, any fees owed to any third party administrators of Benefits as described in the Motion.

### No Previous Request

61.    No prior motion for the relief requested herein has been made to this or any other court.

### Notice

62.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; and (ii) the Debtors' prepetition and postpetition secured lenders. Following the first day hearing in this case, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given..

WHEREFORE, the Debtors respectfully request that the Court enter an order approving the relief set forth above and granting such other relief as is just and proper.

Dated: December 25, 2008

PACHULSKI STANG ZIEHL & JONES LLP

*Laura Davis Jones*

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Bruce Grohsgal (Bar No. 3583)
Curtis Hehn (Bar No. 4261)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            bgrohsgal@pszjlaw.com
            chehn@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession